IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 1, 2012

**TERRENCE GARDNER v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-08616    J. Robert Carter, Judge**

---

**No. W2011-01631-CCA-R3-PC  - Filed July 20, 2012**

---

A Shelby County jury convicted the Petitioner, Terrence Gardner, of first degree felony murder, aggravated robbery, and aggravated assault, and he was sentenced to life plus four years in the Tennessee Department of Correction.  This Court affirmed the Petitioner's conviction on direct appeal.  *State v. Terrence Gardner*, No. W2008-01089-CCA-R3-CD, 2009 WL 3172124 (Tenn. Crim. App., at Jackson, Oct. 5, 2009), *perm. app. denied* (Tenn. Mar. 15, 2010).  In 2010, the Petitioner filed a petition for post-conviction relief, alleging that he had received the ineffective assistance of counsel.  After a hearing, the post-conviction court dismissed the petition.  Finding no error, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Timothy J. Francavilla, Memphis, Tennessee, for the appellant, Terrence Gardner.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Amy P. Weirich, District Attorney General; Betsy Weintraub and A. Brooks Irvine, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

This case arises from the Petitioner's participation in a gas station robbery during which the store clerk was shot and killed and the store owner was shot in the hand.  On direct

appeal, our Court summarized the underlying facts of the case as follows:

At trial, the victim's wife testified that her husband died on the evening of June 12, 2006, while working at the BP gas station at 3727 North Watkins in Memphis, Tennessee.

Robert Malone testified that he was with the [Petitioenr] and Travis Ward on June 12, 2006, at the home of his cousin, Manuel Raynor, in the Frayser neighborhood of Memphis. He testified that, at some point that day, the [Petitioner] showed Raynor a gun, which Malone believed to be a nine millimeter or a .380 handgun. That evening, he walked with the [Petitioner] and Ward to the BP gas station. He testified that he did not know the [Petitioner] brought his gun with him though the [Petitioner] had talked about robbing the Happy Wok, a nearby Chinese restaurant. He said he did not think the [Petitioner] was serious until the [Petitioner] asked Malone to be a lookout. To avoid any involvement in a robbery, Malone testified that he told the [Petitioner] the restaurant was closed.

Malone testified that the [Petitioner] took out the gun when they entered the gas station. At that time, he and Ward ran out of the store. Malone recalled that the clerk was the only person in the store and that he heard a gunshot as he ran across the street. He said that he turned and saw the [Petitioner] "kicking on the door" from inside the gas station. They ran to his cousin's house to get away from the [Petitioner], but they did not phone the police. He testified that the [Petitioner] ran behind them after he "threw something up under a shed." He thought the "something" was the gun.

The [Petitioner] told them to go with him to his house. Malone testified that he went with the [Petitioner] because he was scared the [Petitioner] might kill him. On the walk to the [Petitioner's] house, the [Petitioner] told Malone that he killed the clerk at the gas station. When they arrived, they went to the [Petitioner's] bedroom where the [Petitioner] told him everything that he had done at the gas station, including how he killed the clerk and robbed the gas station. He said the [Petitioner] changed his clothes and shoes and counted the money that he stole from the station. They left the [Petitioner's] house and went to a Kroger grocery store where the [Petitioner] bought candy for Malone and Ward.

Malone testified that he did not tell anyone about the robbery and shooting because he was scared. He said, "I'm not a tough guy wannabe guy.

2

I'm a really fraidy cat. I don't mean to say it like that, but I'm very terrified and petrified of people like him."

Malone spent the night at the [Petitioner's] house before returning to Raynor's house the next morning. Raynor told him that he had gone to the BP station to look for him and that the police probably wanted to talk to him. Raynor took him to a barber shop where his mother picked him up. His mother told him that the police wanted to talk to him.

He gave the police a statement on June 21, 2006, and stated that he knew the [Petitioner] committed the murder. He told police that he had been at the [Petitioner's] house the entire night and that the [Petitioner] left to commit the crimes. Malone stated that the [Petitioner] shot the clerk with a chrome and black .380 handgun because the clerk locked him in the store. He told police that the [Petitioner] kept his gun in a top drawer in his room.

Malone testified that his statement was not entirely accurate and that his mother got upset with him for lying. He gave another statement to police, acknowledging that he and Ward had accompanied the [Petitioner] to the BP station. He also said that he heard approximately three shots as he was running from the BP station. The [Petitioner] told him that a clerk from another store came up to the window of the gas station when he was trying to get out of the station. The [Petitioner] put the gun under a shed and retrieved it the next day. He did not know what the [Petitioner] did with the gun. He maintained that he did not know the [Petitioner] intended to rob the store.

Ward testified that he played basketball with Malone and Raynor on June 12, 2006, and then went to Raynor's house where they met with the [Petitioner]. He recalled that the [Petitioner] showed Raynor a gun which he thought was a .380. He acknowledged that he had previously testified that the gun came from under Raynor's car seat.

Later that evening, he walked with the [Petitioner] and Malone to the BP gas station to get something to eat. He said that the [Petitioner] pulled out a gun when they went inside. He testified that the [Petitioner] had told them that he "put the gun up" before they went to the BP station. He and Malone were able to run out of the store, but the [Petitioner] was locked inside. He recalled hearing a single gunshot as he left the store. The [Petitioner] ran after them when he left the station.

3

When the [Petitioner] caught up to them, Ward noticed blood on his shoes. The [Petitioner] told them that he killed the clerk because the clerk locked the door. They went to the [Petitioner's] house where the [Petitioner] counted the money he had taken from the gas station. The [Petitioner] gave him and Malone some money, and they walked to the store. He did not want to go home because he thought his mother would suspect him of committing the shooting.

Ward told his mother what had happened, and he gave the police a statement on June 21, 2006, identifying the [Petitioner] as the shooter. He said that he was recently indicted for especially aggravated robbery in an unrelated case stemming from a robbery at a laundromat near the BP gas station.

Raynor testified that he was in his car with the [Petitioner], Malone, and Ward on June 12, 2006. He said he was interested in purchasing a gun, and the [Petitioner] showed him a .380 handgun. Raynor later went to work and told Malone that he would drive him home when he got off work. He returned home around midnight but Malone was not there. He drove around looking for Malone and went to the BP station where he told police he was looking for Malone. He saw the [Petitioner] the next morning, and the [Petitioner] told him that he had robbed the BP station and had killed the clerk. The [Petitioner] said that Malone was involved in the offense and that he only shot the clerk because he feared for his life. Raynor gave a statement to police on June 22, 2006, and identified the [Petitioner] from a photographic lineup.

The former owner of the gas station ("Victim Two") testified that the robbed BP gas station was located at 3727 North Watkins in Memphis. He testified that he managed the Citgo station across the street. On the night of the offense, June 12, 2006, he went to the BP station and a man wearing something on his face shot him in the hand through the window. He was unable to identify the defendant from the photographic lineup but believed the man was African-American.

After Victim Two was shot, he returned to the Citgo to phone police. When the police arrived, Victim Two returned to the BP. He saw that the bottom bars of the door had been removed and that the glass was shattered. Police were unable to get inside, because the door was locked. He testified that there is a switch near the counter that locks the door.

Officer Wesley Nelson of the Memphis Police Department testified that

he responded to a call to the BP gas station on North Watkins in Shelby County just before midnight on June 12, 2006. He said that Victim Two had been shot and was bleeding. Victim Two told the officer that the BP was being robbed and that the perpetrator was still inside the building. He and his partner proceeded to the BP and observed the victim lying in a pool of blood on the floor inside the station. They called for backup and forced their way through the locked doors. They determined that the victim was unresponsive and observed that the cash register was open, there were bloody footprints on the floor, and there were holes in the windows.

Officer David Galloway of the Memphis Police Department Crime Scene Unit responded to the BP station on June 13, 2006. He collected evidence, took photographs, and made a sketch of the scene. He said there were four spent .380 casings at the scene. The victim was lying on the floor close to the cash register.

Special Agent Shelly Betts of the Tennessee Bureau of Investigation Firearms Examination Unit tested three spent Remington .380 auto caliber cartridge cases, one fired Winchester brand .380 auto cartridge case, and two bullet fragments. Betts determined that all four cartridge cases had been fired from the same .380 auto caliber gun.

The [Petitioner's] mother testified that approximately one week before June 21, 2006, the [Petitioner] came home "sweaty" and out of breath at 9:30 or 10:00 p.m. The next morning, she went to his room and saw two young men that she did not know. The [Petitioner] identified them as Travis and Robert. She said that she told the boys to leave and that she never saw them again. She recalled that officers from the Memphis Police Department came to her home on June 21, 2006, looking for the [Petitioner]. She gave the officers consent to search the [Petitioner's] bedroom. They collected a pair of the [Petitioner's] shoes, some cell phones, and a notebook. She testified that the writing in the notebook did not look like the [Petitioner's] and that the shoes were not the [Petitioner's] because he wore a different size.

Kevin Lundy of the Memphis Police Department Homicide Unit testified that he was designated as the coordinator of the underlying case. He spoke to Malone and Ward and learned that the [Petitioner] was possibly involved in the shooting of the victim. He said that, initially, Malone was evasive about his involvement, especially in regards to being at the BP station. After Malone's mother became upset with him, he then told more of what

5

happened.

Officer Lundy went to the [Petitioner's] home with a search warrant on June 22, 2006. He ordered the collection of a pair of red and white shoes that appeared to have blood on them located in the [Petitioner's] closet. He also ordered the collection of a notebook from the [Petitioner's] room that contained the handwritten note, "My whole life has changed why? [B]ecause I had to kill a man he and myself had never met."

Officer Demar Wells of the Memphis Police Department testified that he responded to the [Petitioner's] home on June 22, 2006, to collect evidence. He collected a pair of size ten-and-a-half shoes with blood on them and a notepad.

Special Agent Qadriyyah Debnam of the TBI Serology DNA Unit tested the shoes found in the [Petitioner's] bedroom and determined that the blood on the shoes matched the victim's DNA.

The Chief Medical Examiner for Shelby County performed the autopsy of the victim on June 13, 2006. She determined that the victim had gunshot wounds to his neck and his right arm. One bullet went through the victim's arm, and the evidence suggested that the gun was three feet or less from the victim at the time it was fired. The gunshot to the victim's neck tore the carotid artery and entered his cervical spine causing bruising and bleeding of the spinal cord. She opined that the victim died of the gunshot wound to his neck. She also said that a single bullet could have gone through the victim's arm and entered his neck.

Al Pritchard testified that he was housed with the [Petitioner] in prison. He said the [Petitioner] told him that he robbed a store in North Memphis and killed the clerk with an automatic handgun. The [Petitioner] told him he got $1600 from the robbery. He shot the clerk because the clerk reached for a gun. The [Petitioner] told him that he had blood all over his shoes and that the police found the shoes at his house but the shoes belonged to someone else.

The [Petitioner] testified that he played basketball with Raynor, Malone, and Ward on June 12, 2006. He claimed that Ward was wearing the red and white shoes found in his room. They went to Raynor's house after playing, got into Raynor's car, and smoked marijuana. He denied possessing a gun or showing one to Raynor, Malone, and Ward.

He testified that when Raynor went to work, he went back to his house with Ward and Malone so they could get more marijuana. He testified that they could not reach his "weed man" so Ward and Malone left to get more marijuana. He said that they were "sweating hard" and scared when they returned forty-five minutes to an hour later. He testified that Ward said he had robbed and shot "the dope man." He observed blood on Ward's shoes. Ward borrowed a pair of shoes from him and left the bloody pair at his house.

The [Petitioner] testified that they went to Kroger later and that Ward and Malone had a large sum of money with them. He said that they bought some marijuana and beer. He did not believe the story about robbing the "dope man" because they bought additional marijuana. He said that they eventually told him that they robbed the BP station and shot the clerk.

They slept at his house until his mother woke them up. He said Malone went home while he and Ward smoked marijuana with another person. He denied telling Raynor that he had robbed the BP or killed the clerk. He turned himself in on June 23, 2006, when he heard the police were looking for him. The [Petitioner] claimed that the size ten-and-one-half shoes belonged to Ward and that he had never worn them because he wears a size 12. He said the line, "I shot a man I didn't know," was one he heard on the radio. He maintained that he did not go to the BP and did not commit the underlying crimes.

The jury convicted the [Petitioner] as charged with one count of first degree (felony) murder, aggravated robbery, and aggravated assault. He was later sentenced to life for the murder, ten years for the robbery, and four years for the assault. The life sentence and ten-year sentence were to run concurrently, and the four-year sentence was to run consecutively to the other sentence, for a total effective sentence of life plus four years.

Gardner, 2009 WL 3172124, at *1-5.

## B. Post-Conviction Facts

The Petitioner alleged in his petition for post-conviction relief that his trial counsel was ineffective for allegedly failing to properly investigate his case, failing to file a motion to suppress the evidence seized from his bedroom based upon a warrantless search, and failing to file a motion to suppress the evidence seized from his bedroom based upon an unlawful search warrant. During the post-conviction hearing, the parties presented the

7

following evidence: Myra McKenzie, the Petitioner's mother, testified about the search of her home conducted by police officers on June 21, 2006. McKenzie recalled that, at that time, the Petitioner was living with her and had his own bedroom where he kept his personal items. On June 21, 2006, McKenzie was at her home with her other son, Clifton McKenzie, and Clifton's girlfriend when she heard a knock at the door at around 8:00 or 8:30 p.m. McKenzie looked outside her window and saw two Memphis Police Department officers. She opened the door, and the two officers who had knocked on her door entered her home followed by fifteen to eighteen other police officers, all in uniform and possessing weapons. McKenzie described the officers as, "[a]ngry and yelling," saying that the police officers told her to just stay still and tell them the location of the Petitioner.

McKenzie testified that none of the police officers showed her an arrest warrant or a search warrant. McKenzie said she asked the police officers not to go through their house, and they told her that they needed to find the Petitioner because he had done something "bad[]." McKenzie testified she told the police officers that they were not allowed to search her house until they told her "what's going on." The police officers, she said, told her that if she signed a piece of paper they would inform her of the facts surrounding their presence at her house but, if she did not, they would leave to get a search warrant without providing her any information. They told her that, if they had to get a search warrant, they could come back and "destroy" her home. Further, that if they found her son on the streets he could end up dead. McKenzie said that, feeling as if she had no other choice, she signed the consent to search form. McKenzie identified her signature on the consent to search form and said that it looked "shaky." She opined her hand was shaking because she was so nervous at the time she signed the document. McKenzie testified that, during that search, police officers found and confiscated tennis shoes from her son's closet. Later that evening, police officers returned with a search warrant and seized a pair of bloody shoes and a notepad.

McKenzie testified that, during the course of Counsel's representation of her son, she never saw or met Counsel. No one, she said, contacted her about her son's case until a woman, Rachel Geizer, called her nine days before her son's trial was scheduled to begin. She said she told Geizer about the search but that Counsel had not subpoenaed her to testify. The State subpoenaed her to testify, and she testified during the Petitioner's trial.

On cross-examination, McKenzie testified that Geizer informed her that Geizer was an investigator from Counsel's office. She clarified that she spoke with Geizer twice, once shortly after Christmas and once in February, a few days before the Petitioner's trial. McKenzie denied ever talking to another investigator, Kelly Howard. McKenzie agreed that she told Geizer about the search. She said that she told Geizer that McKenzie had told the police officers they could not search her home until they told her what was going on. She said she told Geizer, "I said when [the police officers] told me they would destroy my home

8

if they had to get a search warrant or either if they found my son they would kill him, then I said well, what do I need to do, he's not here."

McKenzie recalled her trial testimony, saying that she had testified that she initially told officers they could not search her home but changed her mind when they told her that they were looking for the Petitioner. McKenzie recalled identifying, at trial, the consent to search form but said that she thought she said during trial that she signed it because the police threatened to kill her son[1].

Upon questioning by the post-conviction court, McKenzie maintained that she only signed the consent to search form because the police threatened to destroy her house and kill her son. She said she believed she informed the trial court of the circumstances surrounding her signing the consent to search form. She acknowledged, however, that the record should so reflect if she had informed the trial court.

The Petitioner testified that Counsel represented him during his trial. The Petitioner said he felt Counsel did not properly investigate a witness, Al Pritchard, who testified against the Petitioner. The Petitioner said that, had Counsel asked the Petitioner about Pritchard, the Petitioner would have been able to tell Counsel about Pritchard's criminal history. The Petitioner said he asked Counsel in writing to obtain the criminal history for each of the witnesses who was going to testify against him, including Pritchard. Counsel, however, never showed him Pritchard's criminal history. The Petitioner explained that, after he was convicted, he researched Pritchard's criminal history and learned that he worked for the state as a witnesses in 1997 and had testified for the state in a prior criminal matter. This, he felt, was important because it impugned Pritchard's credibility. The Petitioner conceded that Counsel cross-examined Pritchard about Pritchard's prior felony convictions, but he said Counsel did not address that Pritchard had previously been a state agent.

The Petitioner also complained that Counsel did not have his best interests in mind while Counsel was representing him. The Petitioner said he filed several letters with both the trial judge and the bar complaining that Counsel did not visit him or discuss the case with him. Counsel failed to file any motions on his behalf, aside from a motion for discovery, and presented him with no defense strategy. The Petitioner recounted that, after he complained about Counsel to the bar, Counsel filed several motions on his behalf. Counsel never, to the Petitioner's knowledge, filed any evidentiary motions to exclude evidence against him.

The Petitioner also complained that Counsel failed to investigate his mother's consent

---

[1]The trial transcript, which is a part of the record herein, reflects that McKenzie made no mention of this during the trial.

to search her home. That search, he said, led to the discovery of a pair of shoes upon which there was the victim's blood and a legal pad with writing on it. The Petitioner said his mother did not have permission to let the police search, or even go into, his bedroom. He noted that his bedroom door was shut, which was his routine to keep others out of his room. The Petitioner said he asked Counsel whether the consent to search was legally obtained, and Counsel told him that it did not matter because the Petitioner's mother signed the consent to search form. The Petitioner said that, after he learned about the circumstances of the consent, he felt that Counsel should have filed a motion to suppress the search.

The Petitioner testified that there was a search warrant that police later obtained to retrieve the shoes and the legal pad from his bedroom. Counsel also neither filed a motion to suppress this search warrant nor objected to this evidence being admitted at trial. The Petitioner explained that he wore a size 12 shoe and that the shoes police found were size 10½. The shoes, he said, belonged to Travis Ward, one of the State's witnesses.

The Petitioner testified that Counsel was ineffective for failing to cross-examine Officer Nelson about the bloody shoe prints found at the scene. He said that, if Counsel had cross-examined Officer Nelson about the shoe prints, Counsel would have established that there was a second pair of footprints, which belonged to the shooter. Further, the Petitioner said this evidence would have supported his contention that Travis Ward and Robert Malone, the two men who testified against him, were the ones who had committed this crime.

During cross-examination, the Petitioner testified that Counsel visited him more than once per month, and, during those meetings, Counsel discussed with him the State's evidence. The Petitioner agreed that Counsel filed a motion for discovery. After the Petitioner wrote a letter to Counsel, Counsel filed several other motions, but he did not file a motion to suppress. The Petitioner agreed that he wrote Counsel and asked Counsel to be removed from his case. Counsel responded to him in writing, saying that only the trial judge could remove him from the case and that the Petitioner needed to file his request with the trial judge.

The Petitioner said he was unaware whether Counsel had spoken with the witnesses who were present during the search of his mother's home. He said Counsel told him that he had hired an investigator to investigate his case, but Counsel never discussed with him any information that the investigator discovered. The Petitioner said he did not have an outside lock to his bedroom, and his mother was allowed to enter the room. He said he did not pay rent to her.

On redirect examination, the Petitioner testified he did, in fact, write a letter to the trial court asking to have Counsel removed, but nothing came of this letter. The Petitioner said

10

that there was never a hearing on the motions that he had asked Counsel to file.

Counsel testified that he represented the Petitioner beginning in 2006 through his 2008 trial and direct appeal. Counsel said that, in order to investigate the Petitioner's case, he had a private investigator appointed to the case. The investigator spoke with witnesses and also with the Petitioner's family. Counsel said he went to the crime scene to review it, and he ran background checks and arrest and conviction histories on all the witnesses. Counsel identified several investigator reports, including the reports of telephone interviews with Myra McKenzie and Clifton McKenzie. There was a second report from a second investigator, who also followed-up with Myra McKenzie. Counsel said, additionally, he personally spoke with Myra McKenzie on at least two occasions.

Counsel testified that, based upon his conversations with Myra McKenzie and his investigation, he did not believe that he had valid grounds to file a motion to suppress the search. Counsel said he did not file a motion to suppress the shoes because the Petitioner was adamant that he was at home at the time of the crime and had an alibi. The Petitioner informed Counsel that the shoes were not his and that he had traded shoes with Ward, giving Ward a set of "Bebe's and Asics tennis shoes." The shoes, he said, were going to be incorporated into their defense, so based upon that fact, and also what Counsel deemed to be a valid consent to search, Counsel decided there were no grounds to file a motion to suppress the shoes. Similarly, Counsel did not file a motion to suppress the legal notepad. He said the notepad contained "rap lyrics" written by the Petitioner.

Counsel said he saw the Petitioner at every court setting and also visited him in jail on at least six occasions. Counsel identified between seven and ten letters he wrote to the Petitioner. Counsel said he was assisted at trial by another attorney and that they visited the Petitioner together while the Petitioner was in jail. Counsel said he went to the jail the night before the Petitioner testified in order to prepare the Petitioner for his trial testimony.

Counsel explained he never questioned Officer Nelson about the bloody shoe prints because the Petitioner maintained he was never in the store. Further, the Petitioner contended that the bloody shoes found in his room were not his shoes. Counsel said he "thoroughly" questioned the police officers about there being nothing on the shoes, DNA or fingerprints or hair or saliva, that tied the Defendant to the shoes. Counsel also had the Petitioner's mother testify that the shoes were not the Petitioner's shoe size. Counsel testified that he provided the Petitioner shoes to wear during the trial, and that they were size 11.

Counsel said he conducted a background investigation on the witness Al Pritchard, which he provided to the Petitioner. He said the State gave him the Jencks' material on each

witness, including Pritchard, early upon Counsel's agreement that he would not provide that information directly to the Petitioner. Counsel said he explained this, and the reasoning behind it, to the Petitioner. Other than this information, Counsel provided the Petitioner all other information he gleaned from his investigation.

Counsel said that the Petitioner wrote a letter to the bar in which he stated that if Counsel did not come and see the Petitioner, the Petitioner threatened to have someone hurt Counsel. Counsel said he also wrote a letter to the bar, in response to the Petitioner's letter, which said that he did not feel threatened by the Petitioner and that he was doing his job.

Counsel said he did not file a motion to exclude Ward and Malone's testimony that the Petitioner had attempted to rob the Happy Wok earlier in the evening because he used the testimony to show inconsistencies in their testimony. He said that the Petitioner maintained he was not with the two men when the robbery occurred. Further, both Ward and Malone admitted they were in a gang, so Counsel attempted to show that they had committed the robbery and not the Petitioner.

Counsel identified his bill on the Petitioner's case, which showed he spent a total of 175 hours on the case, 23.5 of which were in court.

During cross-examination, Counsel testified that he filed the appropriate motions at what he deemed to be the appropriate time. He agreed that because of the late date that he filed the discovery motion, he did not have all of the discovery before the case was set for trial. Counsel testified that he attempted to negotiate a favorable deal with the State. The State had a "no deal" policy and offered only life in prison, an offer the Petitioner refused. Counsel said that the victim's family was from another country, so he investigated whether they had returned to their home country. He said, if they had, the State might have offered a lesser sentence based upon the unavailability of these witnesses.

Counsel said that he thought the most damaging pieces of evidence against the Petitioner were the statements of Ward, Malone, Pritchard, and Manuel Raynor. Counsel felt they had a plausible explanation for the bloody shoes found in the Petitioner's closet. Counsel said he did not file a motion to suppress the shoes or the notepad because he did not think he had a valid basis upon which to file such a motion. Counsel said it was his preference to have an investigator speak to witnesses. He explained that, if the witness became unavailable, he could then call the investigator to testify about the witness's statement. As was his practice, he hired an investigator to speak with McKenzie. The investigator discussed the consent to search form with McKenzie. Counsel agreed that the investigator's statement about the interview did not include details about how the police entered McKenzie's home, whether they had guns drawn, and the circumstances surrounding

12

her signing of the consent to search form.

Counsel said he did not follow up personally with McKenzie but asked his investigator to follow up with her. This occurred two days before the trial. The investigator's report summarized what Counsel recalled McKenzie also told him:

Police came to her house. She looked outside and saw two officers. They opened the door and fifteen more officers rushed in her house with guns pointing at her and her son.

Officers asked where the [Petitioner] was and she advised that he was not at home. Officers kept repeating that they needed to locate the [Petitioner] and advised they were trying to search the home. [McKenzie] told the officers to stop and asked for a search warrant. It was her understanding they did not have a search warrant.

[McKenzie] told the officers she would not allow them to search her home until they told her what was going on. Finally a sergeant informed her of the shooting and she gave them permission to search [the Petitioner's] room. She advised the police the [Petitioner] would not hurt anybody and that is why she granted them permission to search.

Counsel said, based upon this, he did not think that McKenzie was forced, coerced, or threatened into signing the consent to search form.

Based upon this evidence, the post-conviction court dismissed the petition for post-conviction relief, finding:

It is clear in the case at hand; the[] Petitioner's trial counsel was thoroughly prepared. Personally, and through a private investigator, the substance of the State's case was well documented for Petitioner. Additionally, Petitioner shared information and witness information with his attorney.

His allegations that [Counsel] did not represent his best interest are not born out by the record. Complaints about the frequency of jail visits, or the delay in the filing of motions do not indicate "ineffective assistance" unless there was some prejudice to the Petitioner.

The hearing demonstrates that Petitioner and his attorney knew the

13

details of the State's case and had a plan which they hoped would counte[r] act it. The jury accredited the State's case.

A disagreement with the jury's verdict does not automatically equate to failure by the Petitioner's attorney.

The post-conviction court concluded the Petitioner had failed to show that Counsel's performance was deficient or that he was prejudiced by Counsel's performance.

## II. Analysis

On appeal, the Petitioner contends that the trial court erred when it dismissed his petition for post-conviction relief. He asserts Counsel was ineffective by: (1) failing to properly investigate the case; (2) failing to file a motion to suppress the warrantless search of his mother's home; and (3) failing to file a motion to suppress the evidence confiscated by police pursuant to what he alleges was an invalid and unlawful search warrant.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999)*; Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (internal quotations omitted).

15

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The Petitioner first contends his trial counsel was ineffective for not adequately investigating the case. He asserts Counsel's representation fell below an objective standard of reasonableness when he failed to personally speak to the Petitioner's mother about the circumstances surrounding the search. The Petitioner contends Counsel should have personally interviewed his mother rather than send an investigator to conduct the interview. The State counters that, based on all the information available to Counsel at the time, Counsel reasonably concluded that there was not a valid basis for filing a motion to suppress.

We conclude that the Petitioner has not proven by clear and convincing evidence that Counsel was deficient in this regard. Counsel said that he and the Petitioner's mother spoke on two separate occasions, one of which was documented by his records and one of which he specifically recalled, although it was not noted in his time records. He said that, in his conversation with the Petitioner's mother, she was consistent with what she told investigators. Counsel directed investigators on two separate occasions to interview the Petitioner's mother. Counsel said the Petitioner's mother told both him and the investigators that she signed the consent to search form because she did not believe the Petitioner would hurt anyone. We conclude that Counsel's performance in investigating this case did not fall below an objective standard of reasonableness. Further, the Petitioner cannot prove that he was prejudiced by Counsel not interviewing his mother further because Counsel testified he knew about the circumstances surrounding the search and still felt he did not have a valid basis upon which to file a motion to suppress.

The Petitioner next contends that Counsel was ineffective for failing to file a motion to suppress the warrantless search of his bedroom. He asserts that his mother "stepped back from the doorway" and officers entered. He cites *State v. Clark*, 844 S.W.2d 597 (Tenn. 1992), for the proposition that his mother's stepping back from the doorway was not valid permission for the police officers to enter. He further contends that his mother's consent was coerced. Therefore, he states Counsel was ineffective for failing to file a motion to suppress on this basis.

We conclude the Petitioner has not proven by clear and convincing evidence that

16

Counsel was ineffective in this regard. In this case, the Petitioner's mother testified at trial that officers from the Memphis Police Department came to her home on June 21, 2006, looking for the Petitioner and that she gave the officers consent to search the Petitioner's bedroom. Before the Petitioner's trial, McKenzie told Counsel and his investigator that she consented to the search based upon her belief that the Petitioner would not harm or hurt anyone. The evidence does not prove that she merely stepped back from the door and that the police officers took this as an implied consent for their entry. She, in fact, testified otherwise. Similarly, the evidence does not prove that she was coerced into allowing police to search but, instead, consented to the search based upon the belief that her son was innocent of the murder about which the police had informed her. Accordingly, we conclude that Counsel was not ineffective for failing to file a motion to suppress this warrantless search. Further, the Petitioner cannot show that he was prejudiced by proving that, had Counsel filed a motion to suppress, the motion would have been granted. Considering the strong proof that the Petitioner's mother consented to the search of his bedroom, it is improbable that the trial court would have suppressed the evidence gained as a result of the search.

Finally, the Petitioner contends Counsel was ineffective for failing to file a motion to suppress the evidence seized from his bedroom based upon what he alleges was an invalid and unlawful search warrant. This evidence, he states, was obtained directly from the unconstitutional warrantless search of his mother's home. The facts used to obtain the warrant, the Petitioner notes, were not entirely independent and separate from those discovered as a result of the illegal entry into his mother's home. We conclude the Petitioner's argument in this regard must fail. His argument is premised upon the assumption that the police officer's entry into his mother's home was illegal. As we previously concluded, the evidence does not support that proposition. Therefore, the Petitioner cannot show that Counsel was ineffective for failing to file a motion challenging the search warrant or that the Petitioner was prejudiced by his failure to do so.

Further, Counsel testified that he did not move to suppress the bloody shoes because he believed that the defense had a plausible explanation for the shoes. He said that the Petitioner's mother testified at trial that the shoes were not the same size as the Petitioner's, and the Petitioner testified at trial that the size ten-and-one-half shoes belonged to Ward and that he had never worn them because he wore a size 12 shoe. Counsel testified that the fact that the bloody shoes were a different size than shoes worn by the Petitioner supported the Petitioner's contention that the shoes belonged to Ward, who committed this shooting. Counsel's decision in this regard was one of strategy, and we will not second guess that decision. Therefore, the Petitioner is not entitled to relief as to this issue.

17

## III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE